Good morning, Your Honors. Good morning, Counsel. May it please the Court, my name is Mark Jondo for the Plaintiffs in this action, and I'd like to reserve three minutes for rebuttal. All right, now you'll need to pay attention to your time because we won't interrupt you. You'll have to be the conservator of your own time. Of course. Thanks, Your Honors. In this appeal, plaintiffs bring claims on behalf of the MidAmerican Company Retirement Savings Plan, a 401k plan, which is a billion dollar plan, against MidAmerican and certain fiduciaries of the plan for breaches of fiduciary duty from November 13, 2014 through the date of judgment. That's the punitive class period. It is important to remember, though, that this Court, as this Court stated in Davis v. Washington, the decision of 2020, that we are at the pleading stage, and at this point, quote, Additionally, every reasonable inference must be drawn in plaintiff's favor, and if mismanagement is one plausible inference, the case cannot end here. Again, this is a quote from Davis v. Washington. In this case, plaintiffs have pled enough facts to plausibly infer imprudence, and the District Court erred in dismissing the complaint. As the first claim we have is that the defendants breached their duties in failing to monitor the plan's record-keeping fees. Importantly, the District Court was absolutely silent with respect to this primary claim. There was no mention of it in the opinion. Now, Counsel, I think that's a harder claim by far of the two, and it's even hard to get a handle on what's going on factually. But we said in Davis that the disclosures count in terms of figuring out what's in the pleadings. And from what I can tell, you have the direct expenses of $32 to $48 per planned participant, plus $37 in revenue-sharing payments, or $85 per year. But then the survey says $18 to $90 a year is a reasonable amount in the survey. And so if that fits within the range, then how can there be a plausible inference of mismanagement? Well, the issue here is that there was additional revenue-sharing that went to Merrill Lynch. And on paragraph 64 of our complaint, we actually list out what the additional indirect payments to Merrill Lynch was. So the actual payments to Merrill Lynch actually ranged from $300 to $500, all the revenue, when you take the direct compensation and the indirect compensation. How do we resolve that, though? I saw that, and that's creating the hardest issue in this case, and I'm going to ask opposing counsel about it. But the disclosures seem to suggest $85, and then you take the $5,500, form $5,500, and list the $1.8, $2 million in direct compensation. What do we do with the fact that there seems to be inconsistency between the documents and the record, even? Well, firstly, the revenue-sharing was calculated from the investments in the plan. One of the issues, many courts have said this is a factually intensive sort of situation where you go into discovery to get the actual documentation to see what – if Merrill Lynch had rebated some of that money, that's one thing. If they had not, then the inference is that they kept all the money. At this stage of the litigation, we can't tell. All we can tell is how much money was actually – that went to them. Is it possible – really quickly as a follow-up – is it possible that $1.8 million and then it goes to $2.1 million, that that includes investment fees, the expense ratios that are paid to mutual funds? It is not possible. It's not possible. It's not possible how this is structured. The investment – that is different from the revenue-sharing that goes to them. How do we know that from what's in the record? What's before us? Well, we plead it, but – and it's the typical structure. So at this 12B6 stage, you've pled it. You've pledged that that $1.8 to $2.1 million, that direct compensation, should be included. And we take that at face value and say it's properly pledged and that at least is enough to go forward with discovery. Is that your position? It's my position, but it's also not – I don't – the other side doesn't dispute that there's indirect revenue that went to Merrill Lynch. What they're saying is it's not as much as we say went to Merrill Lynch. But even if you look at – even looking at the – just going back to the direct compensation, we cite the surveys, but we also cite additional material that shows that other companies only pay $5 in direct record-keeping. So if you wanted to do an apples-to-apples comparison, you could compare the direct compensation that went to Merrill Lynch with the $5 average that the 401k averages book talks about. And additionally, we cite other sources that say $35 per participant is what the reasonable rate for record-keeping is. And here they've admitted that they paid at least $48 for part of the class period. So there's – even if you were to credit – even if we're just to look at the direct compensation, there's enough in the record to show that there's a plausible claim that what they're paying was not reasonable. At this stage, to dismiss the case is to take everything defendants say at face value and credit nothing that the plaintiffs say. Form 5500 – and that's contemplated by the pleadings. It's part of the record. It was already submitted. You use it, in fact, for proving your case to prove the direct compensation. It suggests that it can include – the instructions say this. It can include the expense ratios, the investment fees, if there's a bundled service. If Merrill Lynch is providing a bundled service, then it's reported as direct compensation. Is that possible here or is that impossible? I mean, we don't know because nobody mentioned whether the service is here or bundled, but do you have any idea? It's sitting here. I don't know. Does that put this in that sort of broad category of cases where the internal fee structure and what's collected is such that it's not actually knowable until there's been some discovery? Yes. Therefore, it's impossible to plead it any more directly than you already have, so the discovery has to go forward just to flesh that out? That's correct, Your Honor. And here, it's not even that we're saying they were overpaying by a few dollars. What we've planned is they were paying hundreds of dollars above what is reasonable. So the inference there, it's not even a close call. There needs to be some further inquiry into this to dig into the facts, where the money went, who kept it, how did it go back. Plus, we do have the surveys that show that other reasonable plans paid for recordkeeping. Well, counsel, don't you have to have some allegations about internal process rather than outcome? You know, the most prudent person can end up with a bad deal. So don't you have to have some allegations with respect to available information about process? Your Honor, that's a very good question. In Braden v. Walmart, this court first stated, and all the courts have picked up on it, that at the pleading stage, the plaintiffs may plead indirect circumstantial evidence to show lack of process. There's a reason for that. The only way to determine what kind of process takes place here, one of the ways is to look at meeting minutes to see what the plan for these issues actually did. But that doesn't always tell the whole story. Typically, once you go into discovery and depositions, you find out whether they actually followed the process they said they were going to follow. We are at a stage where we do not know what they did at these meetings and whether they actually followed through on any process, because it's not just a process. It has to be a meaningful process. The Second Circuit in Suffragette v. NYU just reversed in part a trial verdict and said, look, there's evidence in the meeting minutes that they had a meeting, but we don't know without actually testing it whether the fiduciaries actually met and did what they said they were going to do. Can I ask you about the indirect compensation? We've talked a lot about direct compensation, and the indirect compensation, I can't find anywhere in the record where it comes up, like in any of the disclosures. Usually it's in a 5500, and so I think the other site says, where does this come from? They don't know. I'm asking you where it comes from. So what you do is you look at the investments in the plan, and the investments in the plan are provided by certain management companies. And if you look at the prospectuses, they'll tell you what the expense ratios are and how much of it goes to indirect revenue share. So what we did is looking at the different investments in this plan, we could tell that the expense ratio is X amount, but they're charging above X amount, so therefore the additional is indirect revenue, which is a regular practice. Which, by the way, like I said, it hasn't been denied that there was indirect revenue in this case that went to Merrill Lynch. I think our disagreement is how much indirect revenue went to Merrill Lynch and how much of it they kept. But you do agree that those aren't in the disclosures. Those 68,177 are not in the disclosures. You had to calculate them yourself? Yes. Okay. Correct. So our position is that based on what this court has said in Braden, in Davis, even Miners, and just the general trend of case law and district courts within the circuit, once you show an outsized number for recordkeeping, it's enough to go forward to press on the claims. Our secondary claim here, too, had to do with a few of the funds that the plan offered that we believe were imprudent. Now, in light of the Supreme Court's Hughes v. Northwestern case, it is plausible to go forward and allege that certain funds, not all the funds in the plan, are imprudent. And here what we do is we set forth several benchmarks, either using the ICI median fees, average fees, comparison to performance, comparison to other funds. We look at it in several different ways to show that these funds underperformed. This was different from the Washington v. Davis case and Miners, where the plaintiffs only looked at one particular fund to compare it to the other funds. And lastly, the point I want to make is that we weren't afforded a chance to amend a complaint here. I know we set forth in our complaint why we believe that's incorrect. The case law and the federal rules say that allowing a plaintiff to amend a complaint should be freely given. I think here some of the issues that the court has sort of pointed a finger to could be cleared up in any amendment, although we've tried to clear it up in our briefing. Just one question about that. In the Missouri courts, do they require you to attach a copy of the amended complaint when you ask for an amendment, and do they hold people to it? Your Honor, I don't know the answer to that. But in general practice, if we're going to amend the complaint, we would attach the proposed amendment to the complaint. And there was no particular motion here. It was just like three sentences, and there was no attached complaint here. Does that matter? I think just the asking to amend it should be sufficient on its face. Thank you, Your Honor. So I reserve the rest of my time for rebuttal. All right, good morning. Ms. Chopin? Yes, good morning. And you may proceed when you're ready. May it please the Court. Defendant's position is – I'm Lindsay Chopin on behalf of the Mid-American Defendants. And our position is that this is the exact type of case that needs to be dismissed under Eighth Circuit precedent. There are three main reasons for that. The investment-by-investment claims are not supported by meaningful benchmark. The record-keeping claims don't have a factual basis, nor are they supported by a meaningful benchmark. And any amendment that the plaintiffs wanted to make, he failed to request that in the lower courts, and that opportunity has been waived at this point. What about the way that the Missouri District Courts have handled that? Because I asked the question to opposing counsel. They didn't have an answer for it. But my understanding in looking at the record is that the Missouri Courts really don't hold that rule in high regard. They don't get rid of people because they failed to attach the amended complaint the way that we have some districts in our court to do, in our circuit to do. So what difference does it really make? I mean, it seems to me that the better argument is perhaps it's futile. I mean, then that somehow procedurally they've defaulted. But that's just me. So my understanding in the – so this was pending in the Southern District of Iowa. Is that okay? Yeah, okay. I've got my court wrong because I'm not paying attention. But in Iowa, they don't – whatever the court was, I went and looked at their background, and they don't do this, right? So, like, we do have districts – like, Minnesota and Iowa have a tradition that, yeah, if you get close enough, good enough, whereas we have other districts that, you know, if you don't attach it, it's gone, right? And that doesn't seem to be the practice in Iowa. I think the bigger issue here is not just that plaintiffs failed to attach a proposed amendment. It's that they never asked for leave to amend in the district court. It was never suggested in the briefing at oral argument. We had an expansive oral argument on this case. Nobody – he never asked for leave to amend. And then the order was entered where the order made it clear that it was dismissed with prejudice. And then six days passed before the judgment was entered. So there was a six-day window to ask for leave to amend. And then there was another chance after the judgment was issued where a Rule 59 or a Rule 60 motion could have been filed, seeking leave to amend after the fact, to amend that judgment, to make it without prejudice. None of that happened. We never heard that plaintiffs wanted to amend the complaint until after we got to appeal. And in Mask of Knuffernuffer and in Raynovastar, the 8th Circuit has typically held that that's waived at that point. Counsel, I know this is de novo review, right? Yes, that's correct. But what do you think about this district court order? I mean, you've got seven lines of actual, I guess you could call it analysis of the decision. Seven lines. I mean, even though it's de novo review, shouldn't we expect to have something more than that? And shouldn't the parties be entitled to expect something more than that with respect to analysis and an explanation of the decision? I don't think so, Your Honor. I think that the district court, he considered the briefing. He held an oral argument. Both parties were allowed to speak. We spoke for over half an hour. And the order was issued. And, frankly, the written reasons just aren't required. He could have dismissed the case from the bench during oral argument had he desired, and there would have been no explanation at that point. So I don't think that the lack of explanation in the order really does anything with the appeal. And, also, I think that I don't think anyone can argue that the order is light on analysis. But it does get the overarching gist that there was no meaningful benchmark put in this case. And that applies across the board. Well, that's pretty much all he said. That's all Judge Wooley said. Nothing else. Nothing substantive. He didn't say anything from the bench. He gave no rational understanding. I mean, we are left with, like, no meaningful benchmark. Could have written it in, like, a phrase and signed it. It is a very short order. But the lack of a meaningful benchmark is really what the fundamental error with this case is. There's a lack of a meaningful benchmark. There isn't one for the investment by investment change and minor claims. And Miners v. Wells Fargo and Davis v. Washington University have made clear that when you are challenging a one-to-one investment like that, you have to plead a meaningful benchmark. And he did not do that. The plaintiffs did not do that here. So that is very clear. There's absolutely no reason to disturb that. Let me ask you about the record-keeping expenses. I think I'm just going to tell you what this case is about for me. It's the $1.8 to $3 million in direct compensation. And those are your disclosures. Those are the 5,500s from MidAmerica that actually have those numbers in the disclosures. You can't run from them. They're from Davis. That equals somewhere between $326 and $525 per planned participant. What are those and what is that number made up of? And did we require discovery to figure out how to get to those numbers? We did not need discovery at this stage to state a claim. I think some more explanation of the 5,500s is helpful. The 5,500s are not designed to allege or to disclose what a per-participant record-keeping fee is. That is one of Merrill Lynch's services. If you look at the 5,500s, right next in Schedule C, there's a little list of service codes. Those service codes list out all the different things that Merrill Lynch did. If you go back and look at the ERISA annual participant fee disclosures that are also in the record that MidAmerican provided because it's required to provide those, it explains all the services that Merrill Lynch offers. They are not just the record-keeper. They are the trustee. They are the custodian of assets. They offer investment advisory services that are optional for participants. They process all the loans, hardship deferrals, things like that. And they offer a self-directed brokerage window that has separate record-keeping fees, separate sales charges, trade charges. All of those go into that number of direct compensation. Well, let me ask you this. So does it include the investment fees? That is the expense ratio for the individual funds. Is that part of the direct compensation to Merrill Lynch? There is some investment revenue that is in there if it is investment fees that go to a Merrill Lynch entity. Okay. So here's the problem that I'm having. You've got $326 to $525 per person, whatever this compensation is, okay? But the problem is all the stuff you're stating is supposed to be half as much. There's that NEPC report. And in that NEPC report, it says that other fees, the other fees you're talking about, like check cashing and, you know, supposed to be like 5% or 6%. And that just seems so out of whack with what the national average is for plans of this type. And that's where I bring this back to the meaningful benchmark. The NEPC data is not a meaningful benchmark if you're looking at the 5500s because the NEPC data doesn't talk about self-directed brokerage windows. That's not in that other 6%. Self-directed brokerage windows are completely optional. Maybe participants use them, maybe they don't. Maybe plans offer them, maybe they don't. That's not in that general NEPC data. So if you're going to compare just these record-keeping and distribution and loan services, the apples-to-apples comparison with that NEPC data is really what's in our annual disclosures, that $32 or $48. That's the more apples-to-apples comparison, and that fits with the NEPC data. If plaintiffs are going to insist on using the 5500s and look at all the compensation paid, there is a way to allege a meaningful benchmark. Other cases have done it. We cite Wainer v. Genentech that does it, but there are many others since then that have started doing this. How would you do it? How do those other cases do it? So the 5500s here, what plaintiffs did is they looked at the direct fees and the indirect fees, and they did their calculations. 5500s are filed for every single 401k plan. They can do that for any other 401k plan, and you can look at the service codes, what other plans had similar service codes, what other plans used Merrill Lynch as the same provider, who had the same number of assets, similar number of assets, similar number of participants, because that's what plans are driving this bargaining power to lower fees. Those are apples-to-apples comparisons that you can make, and they just don't make any of those here. So really there's two different ways you can do it. You can look at the ERISA fee disclosures and compare those to the NEPC data. That's one kind of comparison. Or you can look at the 5500s but compare it to something more reasonable like other 5500s for plans. Moving on just to the investment by investment claim, that one, going back to meaningful benchmark, in the briefing in today, plaintiffs have emphasized that they plead multiple benchmarks. But I just want to clarify that the standard is a meaningful benchmark, not multiple benchmark. It doesn't matter how many benchmarks he has. The court has to look at each one and analyze if it's meaningful in comparison to the funds that they're challenging. And that is not what plaintiffs did here in the complaint. The one-to-one comparisons to the Vanguard and Dodgen and Pax fund, that barely even comes up in the appeal briefing from plaintiff's side because that really is very clearly barred under minors and Davis. Those have very different investment styles and are just not comparable. Then you look to the peer group as the other benchmark. The peer group is completely undefined. We don't even know what the peer group is. We don't know what types of funds go into it, what the criteria for inclusion is. So there's no way to assess if those peer groups are all of a similar style, strategy, and structure. We can guess from what we do know about it that it probably isn't because plaintiffs do explain in their briefing that they took the Vanguard fund and the Dodgen Cox fund that I just said were not meaningful benchmarks out of those peer groups. So we already know that those two funds are wildly different. The Vanguard fund, for example, is a growth fund. It looks for high-performing companies and then levels off. So that first year is going to have huge gains. And the plan fund is a value fund that looks for undervalued companies. So it's going to have very slow measured growth, maybe even underperform at the get-go because they're investing in undervalued funds. So those types of comparisons are all within that peer group. So if we can't do a one-to-one comparison, it doesn't seem to make sense to be able to take hundreds of funds together and make that a meaningful benchmark if they all have the same types of issues. And then the same thing happens with the ICI medians. The ICI medians are the fee comparators that they use, the median and average. But also those are huge groups. They contain active and passive funds. They contain value and growth funds. And they don't distinguish between large, mid-cap, and value. So simply putting all those together to make a meaningful benchmark doesn't suffice. And then finally, just one last point on the performance allegations, is that the performance data that they do allege is all based in hindsight. So just to be clear, without alleging underperformance to a non-meaningful benchmark, that's the end right there. That does not state a claim. But an additional flaw on top of that is that the performance data that they put in are trailing returns as of June 30, 2020. That's one snapshot in time at the end of the class period. And those can swing wildly based on the day that you take them. So, for example, the one-year trailing return for the Vanguard Fund as of the end of this quarter, this past quarter, is negative 16%, even though it was 50% in the complaint. So that's how they can kind of cherry-pick performance allegations based on using those trailing returns in hindsight. Unless your honors have additional questions, the defendants would just respectfully request that the court affirm the district court's order. Thank you. Thank you. Thank you, Your Honor. Two points. With respect to the amendment, it was in a six-day window. It was a four-day window. Yeah, not to, you know... Well, the point is there wasn't sufficient time between the court entered the opinion and entered judgment. And as we state in our brief, it created a couple of problems. Well, firstly, at oral argument, there was never any questions from the judge that he had any issues with our complaint that he thought things needed to fix. So, as we explained, by entering the judgment, we could now no longer move under Rule 15. We would have to move under Rule 59. And 59, which I've done many times, is it serves a limited function of correct and manifest errors of law or fact or to present newly discovered evidence. Well, there is nothing in the opinion that we can challenge. And your honors are seeing the same issue here. Were you to decide on this case, you would have to do the work of the district court and go through the different issues that it should have done for the opinion. Yeah, but isn't that like in de novo? Isn't that what we do anyhow? Well, that's true. You could do that, but there's no guidance. I mean, we haven't gotten any help. That part is true. That's right. But still, we have what's in front of us, and it's de novo review, right? Of course, your honor. That is a prerogative to do that or just approve the order without any other comment. With the record-keeping and administration claims, the surveys we cite talk about record-keeping and administration as a whole. So we're doing apples to apples comparison, and that outsized payments that went to Merrill Lynch is comparable to the lower payments the other funds made. Could I ask one more question, Judge Shepherd? Sure. So I think opposing counsel has an excellent point, which is if you want to do an apples to apples, which is what Davis requires, you look at the Form 5500s, right? So you compare the Form 5500s to a survey of other plans of similar size. Why shouldn't we, given there's so many things that go into that direct compensation, why shouldn't we require that in the pleadings? I don't think it's possible because the Form 5500s are limited. They give service codes. They don't explain what's going into it, where the money is going exactly. I'm not sure those surveys look at other service contracts to see generally what the market is paying for those services. I don't know that the Form 5500 is adequate to compare to the surveys. What you can do is you can look at the number of participants, the size of the plan, and know that other plans with the number of participants and size pay a certain amount because it is a commodity service. They all offer the same general services. Thank you, Your Honor. My time is up. Thank you, counsel. All right, the case has been well argued, and it is submitted, and the court will render a decision as soon as it can.